IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO


BEATRICE GUTIERREZ,

        Plaintiff,

v.                                                                         CIV 06-016 JH/KBM

JO ANNE B. BARNHART,
Commissioner of Social Security,

        Defendant.


# **PROPOSED FINDINGS & RECOMMENDED DISPOSITION**

       This social security appeal is before the Court on Plaintiff's motion to reverse or remand. *See Docs. 17-18.* Having carefully considered the entire lengthy record and the parties' arguments, I recommend that the decision of the Commissioner be affirmed.

## **I.  Factual & Procedural Background**

### *A.  Plaintiff's Reported Work History*

       After working twenty-five years, Plaintiff Beatrice Gutierrez[1] retired in 1997 at age forty-six from her position as a caseworker supervisor with the State of New Mexico. She did so because she was eligible to retire and wanted to spend more time with her children. She receives a substantial pension from the State and is therefore not eligible for Supplemental Security

---

[1] Although Plaintiff's counsel refers to Plaintiff as "Guiterrez" in his briefs, the Record indicates that "Gutierrez" is the correct spelling of his client's last name.

Income.  Soon after retiring, Gutierrez worked a short while as a waitress and cashier at a restaurant in 1998.  She left that job because she fell and hurt her knee but also because the business closed.  She looked for other work a few months later, but testified that she was "burnt out" after working for all those years for the State.  She did not leave either job due to the medical conditions that were first diagnosed in the mid-1990's – diabetes, hypertension, and hypothyroidism, and problems with obesity and edema in the lower legs.  *See, e.g., Administrative Record* (hereinafter "*Record*") at 62, 66, 75, 91, 301, 311, 403, 413, 415-16.

### *B.  Plaintiff's Medical Conditions Years Prior To Date Last Insured*

In late June 2001, Plaintiff saw her treating physician Dr. David Cummings for "elbow bursitis" and to follow up on her other conditions.  She indicated that she had the elbow drained three years earlier, but the condition had recurred.  *See id.* at 301.  Dr. Cummings also saw Plaintiff on July 6, 2001, two days after she and her husband had a motorcycle accident, and her right foot had been crushed but not broken.  *See id.* at 166-67, 297-98.  At this visit she also told Dr. Cummings that her family has a history of rheumatoid arthritis and that she had experienced morning stiffness herself.  Because prior lab results showed "mild anemia [he] wonder[ed] if this might mean anemia of chronic disease."  *Id.* at 298; *see also id.* at 302.  He ordered some lab tests to try and rule out autoimmune disease and in the meantime prescribed Tylenol.  *See id.* at 297, 300.

Dr. Cummings saw Plaintiff a month later.  Her elbow was still swollen and when he attempted to aspirate it, he discovered a "strange fluid."  *Id.* at 295.  In addition, her lab results

showed "a grossly elevated ANA of 1-640." *Id.* at 297; *see also id.* at 299.[2] Dr. Cummings therefore made two referrals at that August 9, 2001 visit – one to an orthopedist for removal of the bursa from the elbow and one to Dr. Roderick A. Fields for "further assessment of her auto immune condition." *Id.* at 295.

Years later, Plaintiff chose her onset date as September 1, 2001, right after Dr. Cummings made these referrals.  However, she did not actually see Dr. Fields for another six months after the referral was made.  *See id.* at 62, 214-18, 409.  In the interim, she saw Dr. Cummings twice – she had no symptoms of autoimmune disease and he instructed her to begin an exercise class.  *See id.* at 293-94.  In January 2002, Dr Fields thought Plaintiff probably had "CREST" syndrome[3] and prescribed an antimalarial medication[4] that is also used for arthritis and lupus.  *See id.* at 218.  A year and a half later, Dr. Fields was still of the opinion that her "autoimmune syndrome . . . is probably CREST syndrome."  *Record* at 179.

---

[2]  "ANAs indicate the possible presence of autoimmunity and provide, therefore, an indication for doctors to consider the possibility of autoimmune illness."  *www.medicinenet.com/antinuclear_ antibody/article.htm.*

[3]  "CREST syndrome: A limited form of scleroderma, a disease of connective tissue with the formation of scar tissue (fibrosis) in the skin and sometimes also in other organs of the body."  *www.medterms.com/script/main/art.asp?articlekey=13546*  The acronym "CREST stands for  "Calcinosis (the formation of tiny deposits of calcium in the skin)," "Raynaud's phenomenon (spasm of the tiny artery vessels supplying blood to the fingers, toes, nose, tongue, or ears);" "Esophagus (esophageal involvement by the scleroderma)," "Sclerodactyly (localized thickening and tightness of the skin of the fingers or toes);" and "Telangiectasias (dilated capillaries that form tiny red areas, frequently on the face, hands and in the mouth behind the lips).  *Id.*

[4]  The drug "hydroxychloroquine" which goes by the brand name "Plaquenil" is "classified as an antimalarial medication" and is prescribed for "several forms of malaria attacks.  It is also useful in treating patients with the local skin (discoid) and systemic forms of lupus erythematosus.  In those with systemic disease, it has been found to particularly relieve skin inflammation, hair loss, mouth sores, fatigue, and joint pains.  It has also been found helpful in preventing relapses of active disease. Hydroxychloroquine is also useful in treating rheumatoid arthritis."  *www.medicinenet.com/ hydroxychloroquine/article.htm.*

Dr. Fields treated Plaintiff for CREST syndrome at least through late 2004, usually every three or four months. Dr. Cummings also saw Plaintiff regularly for her diabetes, hypertension, hypothyroid, edema and obesity, usually at least once a month. Thus, she has extensive medical documentation of her conditions and complaints and symptoms from spanning early 2001 through early 2005.

Dr. Cummings' medical records show that Gutierrez' control of her diabetes varies widely, due to Plaintiff not consistently following a diet or testing her sugar levels or taking her diabetes medications. Her hypertension and hypothyroidism are generally well-controlled with the medications she is prescribed. *See id.* at 241, 248, 227, 252, 255, 264, 266, 276-77, 289-94, 298, 301-02, 308, 333. Furthermore, through mid-2004, Dr. Fields' records consistently show no joint swelling, deformity, limited range of motion, tenderness, crepitus, or trigger points in the upper or lower extremities. *See id.* at 169-70, 171, 179-80, 185, 189, 196-977, 201, 206, 216, 354.

Although she testified at the hearing that in approximately March 2003 a doctor "advised her" to use a cane, no medical record makes mention of a cane. *Id.* at 412. In fact, the orthopedist record from March 2003 for a followup on her knee MRI says she was "doing much better" and "walking without a limp." *Id.* at 133. And, despite all of these conditions, Plaintiff's medical records indicate that she was working in 2001, 2002 and 2003 when she was still in her early fifties. In fact, she sought and received a return to work note from Dr. Cummings in October of 2003.[5]

---

[5] *See id.* at 306 (4/9/01: Plaintiff is trying to quit smoking and with "changes in the law it is going to be hard for her to smoke anyway while she is working."); *id.* at 301 (6/22/01: Plaintiff "doing much better, taking Lasix PRN and wears her compression stockings at work"); *id.* at 292 (1/18/02: Plaintiff is "under a lot of stress having to look after her mother and helping with her deceased sister's husband and continuing to work"); *id.* at 134, 264 (in early 2003, primary doctor notes she had x-rays for right knee

*C. Plaintiff's Medical Conditions Just Prior To Expiration Of Date Last Insured & Beyond*

On December 29, 2003, two days before the date she would last be insured for disability purposes, Dr. Cummings admitted Plaintiff to the hospital for tests. On that date at an office visit, Gutierrez exhibited "elevated blood sugars . . . generalized weakness . .. [low blood] pressure [and] melena for three weeks,"[6] and the examination revealed "some small gastric varices and some esophageal varices." *Id.* at 143. Four weeks later, on January 26, 2004, Plaintiff complained to Dr. Cummings about feeling weak, having become dizzy in the shower, and falling in the bathtub. He again diagnosed esophageal varices and referred Plaintiff to Dr. Dominique Wong for assessment and treatment of the condition. *Id.* at 233. Plaintiff filed an application for benefits three days later, asserting the onset of her disabling condition began years earlier. *Id.* at 62.

"Varices" are dilated blood vessels in the esophagus or stomach that can be dangerous if they rupture.[7] Plaintiff's physicians believed she developed the varices due to liver disease,

---

pain resulting from a slip; and orthopedist record states she "was ambulating at work when . . . she felt a twist in her knee."); *id.* at 247-48 (10/30/03: Plaintiff followup for a fall and ankle injury: "She needs a note to return to work" and doctor gave it to her); *id.* at 98 (daily activities mention working: "problems handling my mother's business with my brother").

[6] "Melena: Stools or vomit stained black by blood pigment or dark blood products." *www.medterms.com/script/main/art.asp?articlekey=4343.*

[7] "Varices are dilated blood vessels usually in the esophagus or stomach. They cause no symptoms unless they rupture and bleed." *www.medicinenet.com/bleeding_varices/article.htm.*
"Bleeding from varices is a life-threatening complication of portal hypertension. Portal hypertension is an increase in the pressure within the portal vein (the vein that carries blood from the digestive organs to the liver) due to blockage of blood flow throughout the liver." *Id.* "This increased pressure in the portal vein causes the development of large, swollen veins (varices) within the esophagus and stomach. The varices are fragile and can rupture easily, resulting in a large amount of blood loss." *Id.* "The most common cause of portal hypertension is cirrhosis of the liver. Cirrhosis is scarring which accompanies the healing of liver injury caused by hepatitis, alcohol or other less common causes of liver damage. In cirrhosis, the scar tissue blocks the flow of blood through the liver and slows its processing functions." *Id.*

possibly caused either by the medications she had been taking for diabetes or by her autoimmune disease. *See id.* at 226, 233, 328, 333-34. The surgical solution is to "band" the varice,[8] and Plaintiff underwent four such procedures later in 2004. *See id.* at 374-78, 379-89.

After her second banding session and initial denial of benefits by the Administration, Dr. Cummings wrote a "to whom it may concern" letter dated May 28, 2004, stating:

> Ms. Gutierrez has applied for disability and apparently has been turned down. She has autoimmune disease, which has caused multiple joint and muscle symptoms. In the past this has disabled her from working. Initially she was doing better with medications started by the rheumatologist back in 2001. She unfortunately had an upper GI bleed earlier this year and subsequently was found to have biliary cirrhosis and esophageal varices secondary to her autoimmune disease. This has limited our ability to use a number of medications with her and her diabetes has subsequently become poorly controlled. Her autoimmune disease, diabetes, obesity and liver cirrhosis with pulmonary hypertension all go together to effectively disable her from gainful employment.
>
> I am going to ask the patient to get letters from her rheumatologist, Dr. Fields, and her gastroenterologist, Dr. Wong, regarding her conditions. Thanks for your considerations.

*Id.* at 226; *see also id.* at 328 (Dr. Cummings medical record entry from 2/3/05 stating Plaintiff "has not been approved for disability, although she is clearly disabled from any gainful employment.").

Soon after the Dr. Cummings letter, Dr. Fields discovered Plaintiff had "multiple trigger point tenderness" and eventually assessed her with fibromylagia.[9] After Plaintiff's request for

---

[8] "A procedure performed by a gastroenterologist in which small rubber bands are placed directly over the blood vessels (varices). This will stop the bleeding and eradicate the varices." *www.medicinenet.com/bleeding_varices/article.htm.*

[9] *Compare id.* at 345 (05/3/04 office visit showed no trigger points or tenderness) *with id.* at 353 (6/6/04 office visit revealed multiple trigger point tenderness and doctor wants to do a sleep study); *id.* at 352 (8/3/04 office visit assessed her with "fibromyalgic pain prob [associated with] sleep [illegible]"); *id.* at 351 (10/4/04 office visit revealed multiple trigger points and assessed with "fibromyalgic [illegible]").

reconsideration was denied, she sought a hearing before the ALJ based on Dr. Cummings letter. Dr. Fields also wrote to the Social Security Administration on October 26, 2004, stating in full that Plaintiff "has CR[E]ST syndrome, primary cirrhosis with a history of bleeding esophageal varices, and fibromyalgic pain. I agree with a disability evaluation for the patient." *Id.* at 349; *see also id.* at 36, 44. Dr. Wong did not submit a letter the Administration.

### *D. ALJ's Opinion & Appeal*

Plaintiff was represented by a lay person at the hearing before ALJ Cole and at the Appeals Council level. *See, e.g., id.* at 36-37, 392-99. ALJ Cole noted that because her date last insured was December 31, 2003, Plaintiff must establish disability on or prior to this date." *Id.* at 18. He considered all of the conditions mentioned anywhere in Plaintiff's medical records – diabetes, cirrhosis with esophageal varices, CREST syndrome, obesity, right knee impairment, osteopenia, and depression. He found that the conditions either were not severe or did not meet any Listing, and that Plaintiff had the residual functional capacity to perform a limited range of sedentary work. *Id.* at 18-20.

With the aid of the testimony from a vocational expert, ALJ Cole identified three such jobs Plaintiff could perform – production time keeper, check cashier, and information and referral aid. *Id.* at 23. ALJ Cole therefore denied benefits, finding her not disabled at Step 5, under the framework of Medical-Vocational Rule 201.15. *Id.* at 24. The Appeals Council declined review on November 4, 2005, thereby rendering the ALJ's decision final. *Id.* at 5. This appeal followed, where Plaintiff is represented by an attorney. *See Doc. 18* at 5 n.5.

## **II.  Standard Of Review**

If substantial evidence supports the ALJ's findings and the correct legal standards were

7

applied, the Commissioner's decision stands and Plaintiff is not entitled to relief.  *E.g., Grogan v. Barnhart,* 399 F.3d 1257, 1261 (10th Cir. 2005); *Hackett v. Barnhart,* 395 F.3d 1168, 1172 (10th Cir. 2005); *Langley v. Barnhart,* 373 F.3d 1116, 1118 (10th Cir. 2004); *Hamlin v. Barnhart,* 365 F.3d 1208, 1214 (10th Cir. 2004)  My assessment is based on a "meticulous" review of the entire record, where I can neither reweigh the evidence nor substitute my judgment for that of the agency.  *E.g., Grogan,* 399 F.3d at 1262; *Langley,* 373 F.3d at 1118; *Hamlin,* 365 F.3d at 1214. "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Langley,* 373 F.3d at 1118 (internal quotations and citations omitted); *see also Grogan,* 399 F.3d at 1261; *Hackett,* 395 F.3d at 1172; *Hamlin,* 365 F.3d at 1214.  An ALJ's decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it."  *Langley,* 373 F.3d at 1118 (internal quotations and citations omitted); *see also Grogan,* 399 F.3d at 1262;*Hamlin,* 365 F.3d at 1214.

## III.  Analysis

Plaintiff raises two issues:  (1) whether the ALJ erred in failing to call a medical advisor under Social Security Ruling 83-20; and (2) whether the ALJ's hypotheticals to the vocational expert were deficient.  *See Doc. 18.*

### *A.  Social Security Ruling 83-20*

Dr. Cummings rendered his opinion on the ultimate decision of disability.  However,  "[a] physician may opine that a claimant is totally disabled, but that opinion is not dispositive because final responsibility for determining the ultimate issue of disability is reserved to the [Commissioner]."   *Hunter v. Barnhart,* 2006 WL 3334513, *3 (10th Cir. 2006) (internal

8

quotations and citations omitted).  Dr. Cummings did not give an medical opinion about whether Plaintiff met a Listing or about her residual functional capacity or about her specific limitations, and Plaintiff makes no argument that the ALJ misapplied the "treating physician" rule in that regard.  *Compare, e.g., Watkins v. Barnhart,* 350 F.3d 1297 (2003).

Rather, Plaintiff's attempts to bring Dr. Cummings' opinion within the purview of Social Security Ruling 83-20.  *See Social Security Ruling 83-20* (hereinafter "*Ruling*")*,* 1991 WL 31249 (1991).  Gutierrez contends that because her medical conditions became progressively worse over time and because the date last insured was a key issue, ALJ Cole should have called a medical expert to determine exactly when Plaintiff became disabled.  In particular, she asserts that Dr. Cummings' disability opinion letter makes the medical evidence of record "ambiguous," and the ALJ should not have summarily dismissed it because the letter post-dated the time she was last insured.  She asserts that the ALJ Cole should have "recontacted" Dr. Cummings and used him as the medical expert to decide whether the "disability" he later identified could have existed before the date last insured.

For this proposition, Plaintiff relies primarily on a recent decision by the Tenth Circuit in *Blea v. Barnhart,* 466 F.3d 903 (10th Cir. 2006).  *See Doc. 18* at 7-11; *Doc. 20* at  2-4.  Under Ruling 83-20, for "'disabilities of nontraumatic origin, the determination of onset involves consideration of the applicant's allegations, work history, if any, and the medical and other evidence concerning impairment severity.' . . . **Medical evidence, however, is the 'primary element' for the onset determination, as the onset date 'can never be inconsistent with the medical evidence of record.'**"  *Blea,* 466 F.3d at 909 (quoting *Ruling* at \*\*2, 3) (emphasis added).  Significantly, Plaintiff does not challenge any of the underlying findings the ALJ made

9

based on the medical evidence – severity, Listings, residual functional capacity – and those findings support the nondisability determination.

In addition, *Blea,* and the legal principles upon which it relies are inapposite, foremost because there the ALJ found the claimant ***was in fact disabled*** but the date when he became so was not clear.[10]  As an earlier Tenth Circuit decision affirming this District held, the plain language of the Ruling does not come into play unless there is a finding of disability.

> The policy statement accompanying Ruling 83-20 defines an onset date as "the first day an individual is disabled as denied in the Act and the regulation." . . . Thus, the onset date relates to the date of *disability.* Here, the ALJ determined that Mr. Webb did not have a server impairment. Substantial evidence supports that conclusion. Consequently, we do not reach the question of when any disability started. Without a severe impairment, there can be no disability. The ruling does not apply.

*Webb v. Secretary of Health & Hyman Servs.,* 1994 WL 50459 (10th Cir. 1994) (emphasis original); *see also Ruling* at *1 ("In addition to determining that an individual is disabled, the decisionmaker must also establish the onset date of disability. . . . The onset date of disability is the first day an individual is disabled as defined in the Act and the regulations.").

A key second distinguishing factor is whether the medical evidence is "ambiguous" as defined by Tenth Circuit precedent. In the nontraumatic disabilities situation, the Tenth Circuit holds that the ALJ is "obligated to call on the services of a medial advisor" under Ruling 83-20 only if the "'medical evidence of onset is ambiguous.'" *Blea,* 466 F.3d at 911 (quoting *Reid v.*

---

[10] *See Blea,* 466 F.3d at 906 ("Upon reconsideration . . . Blea was found to be disabled and entitled to supplemental security income . . . as of at least March 1, 2002 . . . due to both post-traumatic arthritis and dysthymia. Nonetheless, the Commissioner denied . . . disability insurance because she determined that any impairments . . . were 'not disabling on any date through 12/31/98 the last day insured status for disability was met.'"); *id.* at 908-09 ("It is not disputed that Mr. Blea is currently disabled under the Act. What is in dispute is when Mr. Blea became disabled.").

*Chater,* 71 F.3d 372, 374 (10th Cir. 1995)). ).  The ambiguity determination rests on whether the progression of the condition is ***clearly documented*** or not.  "Thus, the issue of whether the ALJ erred by failing to call a medical advisor turns on whether the evidence concerning the onset of Mr. Blea's disabilities was ambiguous, or alternatively, whether the medical evidence clearly documents the progression of his conditions."  *Id.* at 912.

In *Blea,* the claimant's medical record was "indisputably incomplete" and "silent" for the relevant six-month period because it did not document the status of his post-traumatic arthritis,.  Yet a year after the date last insured, the medical records did show limitations of the very complaints found to be disabling.  Also, there the ALJ did not have the benefit of a treating physician letter submitted to the Appeals Council that was of the opinion the disabling pain was constant over the relevant time frame.  *Id.* at 912-13.  Furthermore, the other *Blea* condition was found to be disabling as of a date before he first went for treatment for the condition.  *Id.* at 914.  Both instances – a slowly progressing impairment with an early alleged onset and date last worked, but no medical records available, and disability occurring prior to the date of the first medical exam – are instances the *Blea* court noted where the Ruling would contemplate the need to infer the onset date with the help of medical advice.  *See id.* at 909-10.

In contrast, here "the record contains copious medical records and other contemporaneous evidence of [the claimant's] condition, as well as information from [the] hearing," and clearly documents the progression of Plaintiff's conditions both before and after her last insured date.  *Wiederholt v. Barnhart,* 121 Fed. Appx. 833, 38 (10th Cir. 2005).  Thus, there was no "ambiguity" triggering a need to recontact Plaintiff's doctors for any reason.  "[I]t is not the rejection of the treating physician's opinion that triggers the duty to recontact the physician;

rather it is the inadequacy of the 'evidence' the ALJ 'receives from [the claimant's] treating physician' that triggers the duty." *White v. Barnhart,* 287 F.3d 903, 908 (10th Cir. 2002) (opinion on rehearing). Under these circumstances, "an attempt to make a retrospective diagnosis of disabling depression would be speculative and unsupported." *Wiederholt v. Barnhart,* 121 Fed. Appx. 833, 38 (10th Cir. 2005); *see also Adams v. Apfel,* 1998 WL 717271 at *2 (10th Cir. 1998) ("Here there was no ambiguity. The medical evidence established the Plaintiff could perform work through the date of expiration of his insured status. We conclude the ALJ did not err in failing to call a medical advisor.").

Therefore, I recommend that this assignment of error be rejected.

### *B.  Hypotheticals*

One of alleged limitations Plaintiff raised in her testimony was "concentration." She mentioned lack of concentration when testifying about her depression, telling the ALJ that it interferes with her daily activities because "all I do is basically sit there and cry. I can't concentrate and it's like I can't -- when my husband talks to me, I can't hear what he's saying to me." *Record* at 415. Her lay representative did not ask Plaintiff more detail about lack of concentration, but did elicit other limitations such as: standing for fifteen minutes, sitting for half an hour, use of an electric cart at Wal-Mart, and alternate sitting and standing. *See id.* at 418-19.

The ALJ gave the vocational expert two hypotheticals, the second of which assumed that Plaintiff had all of the limitations she testified about at the hearing. In response, the vocational expert identified the three positions that the ALJ relied upon above in reaching his finding of not disabled. *See id.* at 421-22. When the lay representative questioned the vocational expert about his opinion, the representative only mentioned concentration in connection with the ***timekeeper***

*job,* and the following discussion ensued:

>   Q      Okay.  And the problem with decreased concentration, would that affect *this job*?
>
>   A      The –
>
>   REP:   The Claimant testified that sometimes even her husband talks to her –
>
>   ALJ:   Perhaps you ask him to assume –
>
>   REP:   Oh, okay.  Assume that if someone talks to a person and they're not even comprehending what's being said because of the pain medication, they're not concentrating, whatever reason.  Would that affect her ability to be productive on this job?
>
>   VE:    Yes, it would.  Of course, depending on the degree to which it deteriorated.  I use the information and referral rate where you're talking with people and giving out information.  If the concentration reached a point where it was interfering almost constantly, she wouldn't be able to do *that job*.
>
>   REP:   Okay.  Those were all the questions I had, Your Honor.

*Id.* at 424 (emphasis added).

Notwithstanding that this aspect of the vocational expert's opinion was limited to only one of the positions, in his opinion ALJ Cole noted this exchange and construed it to cover each of the three positions:

> The vocational expert also testified that decreased concentration would affect the ability to do the above jobs depending on the degree of the concentration loss.  However, the evidence in the record does not support a finding of concentration loss to such a degree that the claimant would be precluded from performing low-end semi-skilled jobs such as the ones set forth above.

*Id.* at 23.

Plaintiff argues that because the ALJ did not clearly define the degree of Plaintiff's

13

"concentration" impairment to the vocational expert, his hypotheticals were impermissibly imprecise, and his decision relying on them is therefore not supported by substantial evidence. Plaintiff is correct that vocational expert testimony "elicited by hypothetical questions that do not relate with precision all of a claimant' impairments cannot constitute substantial evidence. *Hargis v. Sullivan,* 954 F.2d 1482, 1949 (10th Cir. 1992). However, "the established rule" [is] that such inquires must include . . . only . . . those impairments borne out by the evidentiary record." *Evans v. Chater,* 55 F.3d 520, 532 (10th Cir. 1995). The hypothetical at issue here falls into the latter situation and is not erroneous.

Plaintiff attributed her lack of concentration to depression, a condition that the ALJ found was not severe at Step 2 because the depression no more than mildly impacted Plaintiff's ability to concentrate. Plaintiff does not challenge the severity finding here.[11] "The ALJ found no significant limitations resulting from the [depression] impairment, and substantial evidence supports this finding. Hypothetical questions 'need only reflect impairments and limitations that are borne out by the evidentiary record .' *Decker v. Chater,* 86 F.3d 953, 955 (10th Cir. 1996)."

---

[11] He held:

> Although the claimant presented on November 11, 2002 with complaints of depression and crying spells, by December 10, 2002 the claimant's depression was under good control with Paxil. She reported being in a much better mood and had no more crying spells (Exhibits 11-F, pp. 41 and 42). Therefore, the claimant has not had a "severe" depression impairment lasting for a continuous period of twelve months or more. The claimant did not have more than a mild restriction on her activities of daily living and more than mild difficulties in maintaining social functioning and concentration, persistence or pace, pursuant to Parts B1, B2, and B3, for a continuous period of twelve months or more. Pursuant to Part B4, the claimant has had no episodes of decompensation, each of extended duration.

*Record* at 19.

*Tucker v. Barnhart,* ___ Fed. Appx. ___, ___ 2006 WL 2981287 (10th Cir. 10/19/06).

Indeed, no medical record mentions lack of concentration, much less an "almost constant" state. And her treating physician's opinion letter about what renders Plaintiff disabled does not mention depression or concentration at all. Moreover, in her lengthy responses to the Daily Activities Questionnaire, Plaintiff circled some of the options listed – depression, anxiety, panic attacks, and memory – but did not circle the concentration option. *See Record* at 88. In fact, her description of what she has to do for her "memory problem" is entirely consistent with the ALJ's "mild" finding.[12]

I find that a "mild" impairment in memory, that results in a fifty-year old making "to-do" lists and keeping notes of appointments, cannot be conflated to an "almost constant" inability to concentrate. Accordingly, I recommend this assignment of error also be rejected.

Wherefore,

---

[12] She explained:

> I had been having family problems around issues dealing with my employment, my children and family relatives with my husband. Then my sister passed away and that's when I started taking medication and continue to do so. Also, more recently having my mother pass away. From these, developed problems in handling my mother's business with my brother and especially my older sister. Right now I do feel a lot of anxiety of all the family discord and especially due to our financial situation now. I just recently experienced a panic attack when I was driving for an appointment to the doctor and felt scared because I suddenly did not know where the office was or how to get there. Luck[i]ly, my husband was with me and I asked him. After he told me, I just started crying and felt my heart was beating faster. I hope this doesn't happen ever again. I am at a point of making lists of things I have to do, calls to be made, grocery list, and practically writing down all of a phone conversation dealing with business. I also keep a list of appointments as they are made.

*Id.* at 88, 98

**IT IS HEREBY RECOMMENDED** that Plaintiff's motion to reverse or remand *(Doc. 17)* be denied, and the decision of the Commissioner affirmed.

---

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 10 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the ten-day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**

---

_____
UNITED STATES MAGISTRATE JUDGE